**UNITED STATES of America**
v.
**SEABOARD SURETY COMPANY.**
**UNITED STATES of America**
v.
**NATIONAL SURETY CORPORATION**
(two cases).
**Civ. Nos. 8423–8425.**

United States District Court
D. Maryland, Civil Division.
May 3, 1956.

George Cochran Doub, U. S. Atty., and William F. Mosner, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Randall C. Coleman, Jr., and Ober, Williams, Grimes & Stinson, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

These consolidated cases arise under section 256 of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1286, which reads as follows:

"Discharge of alien crewmen; penalties

"It shall be unlawful for any person, including the owner, agent, consignee, charterer, master, or commanding officer of any vessel or aircraft, to pay off or discharge any alien crewman, except an alien lawfully admitted for permanent residence, employed on board a vessel or aircraft arriving in the United States without first having obtained the consent of the Attorney General. If it shall appear to the satisfaction of the Attorney General that any alien crewman has been paid off or discharged in the United States in violation of the provisions of this section, such owner, agent, consignee, charterer, master, commanding officer, or other person, shall pay to the collector of customs of the customs district in which the violation occurred the sum of $1,000 for each such violation. No vessel or

aircraft shall be granted clearance pending the determination of the question of the liability to the payment of such sums, or while such sums remain unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of an amount sufficient to cover such sums, or of a bond approved by the collector of customs with sufficient surety to secure the payment thereof. Such fine may, in the discretion of the Attorney General, be mitigated to not less than $500 for each violation, upon such terms as he shall think proper. June 27, 1952, c. 477, Title II, ch. 6, § 256, 66 Stat. 223."

In each case the government contends that an alien seaman was paid off or discharged in violation of section 256, in two cases by the master of the vessel, in one case by the British Consul. In each case notice of intention to impose a fine under section 256 was served on the agent of the vessel involved. In each case the agent of the vessel, as principal, and the defendant surety company, as surety, executed a bond conditioned that such "principal shall pay to the Collector of Customs * * * any and all fines (or penalties) imposed by the Attorney General under the said sections * * * of the said Act against the owner, master, commanding officer, purser, person in charge or command, agent, charterer, or consignee of the said vessel".[1] In each case the District Director of the Immigration and Naturalization Service imposed a fine on the agent.

In one case, involving the Panamanian S. S. La Myra, the question is raised whether the alien crewman was "paid off", as that term is used in section 256, or whether he was merely paid his wages to date. In the other two cases it is ad-mitted that the alien crewman was discharged without the consent of the Attorney General.

In all three cases the question is raised whether the fine was properly imposed on the agent, since the agent did not pay off or discharge the alien crewman.

## Findings of Fact.
### Civil No. 8423

Findings of fact in the other two cases will be filed, but need not be set out in this opinion.

The La Myra, a vessel of Panamanian registry, arrived at the Port of Baltimore on January 21, 1953, at which time an immigrant inspector examined the crew, including alien seaman Evangelos Georgios Bouboulinis. Bouboulinis was granted a D–1 landing permit by the inspector. This permit contained the following legend: "You are required to depart from the United States on next sailing of named vessel. You may not be paid off or discharged in the U. S. In no event is stay authorized beyond 29 days." No copy of a D–1 landing permit is furnished to the master or the agent, but the master is advised which crewmen have been allowed shore leave and which ones should be detained on board. If the immigration officers had concluded that Bouboulinis should have been detained on board the vessel, a notice to that effect would have been given to the master or officer in charge of the ship.

Bouboulinis' articles of employment still had about six months to run, but since he desired to terminate his employment aboard the La Myra, and the master was willing to comply with this desire, the master made application to the Immigration and Naturalization Service to change the alien's landing permit from a D–1 to a D–2. A D–2 land-

---

1. The bonds were old forms (Rev. 1–15–45), prepared for use under the law before the 1952 Act was adopted. The parties are agreed, however, that the bonds were intended to cover any liability under the 1952 Act, and may be treated as having been reformed to refer to the appropriate sections of the Immigration and Nationality Act of 1952 rather than the sections of the Immigration Act of 1924 to which they actually refer, and otherwise treated as though they had been executed on the new form.

ing permit would have allowed Bouboulinis to ship out on a different vessel from the one to which he was then attached, within a period of 29 days. 8 U.S.C.A. § 1282(a) (2). This application was refused.

Bouboulinis later appeared personally at the Immigration and Naturalization Service office in Baltimore on January 26, 1953, to request that his landing status be changed from D–1 to D–2. His application was also refused.

During the course of his conversation with the immigration officers, Bouboulinis revealed the fact that he had been paid all his earned wages by the master on January 23, 1953. The Panamanian law provides that earned wages are to be paid to crewmen in ports where cargo is discharged. The La Myra discharged cargo in Baltimore.

When the immigration officers learned that Bouboulinis had been paid his earned wages, his D–1 landing permit was revoked, he was placed aboard the vessel, and sailed with her when she departed from Baltimore at 5:40 A.M. on January 27, 1953.

At 2:45 P.M. on January 28, 1953, Terminal Shipping Company, the local agent for the vessel, was served with a notice of intention to fine in the amount of $1,000 for paying off Bouboulinis without consent of the Attorney General. The notice is a printed form of the Immigration and Naturalization Service, with blanks filled out and signed by the District Director. The notice, dated January 27, 1953, was addressed to Terminal Shipping Company, its name and address being typed in over the printed words "(Master, Commanding Officer, Purser, Person in charge, Owner, Agent or Consignee) of the vessel or aircraft"; then followed a blank in which the name and registry of the ship were typed. The form of notice states: " * * * you are hereby notified" that on the basis

of the evidence of record it is indicated that a fine should be imposed under section 256 of the Immigration and Nationality Act on the following grounds: For paying off the alien named without consent of the Attorney General; grants an opportunity to show cause why a fine should not be imposed or, if imposed, why it should be mitigated or remitted; grants a hearing, if requested, at which counsel may appear or submit briefs; and concludes "The vessel or aircraft on which the alien (or aliens) arrived will be granted clearance papers when ready to depart and allowed to proceed upon the outward bound voyage on condition that you deposit with the Collector of Customs at this port, prior thereto, the sum of $1,000 or, when permitted by the Immigration and Nationality Act, a bond with sufficient surety to secure the payment of the fine should it be imposed."

On February 9, 1953, Terminal Shipping Company, through Ober, Williams, Grimes & Stinson, attorneys for the La Myra, filed a petition for remission or mitigation of the proposed fine with the District Director of the Immigration and Naturalization Service at Baltimore.

On March 30, 1953, bond in the amount of $1,000 was filed with the Collector of Customs, Baltimore, to secure the payment of any fine imposed by the Attorney General, and to insure that the La Myra would not be seized at United States ports of call.[2] These reasons for filing the bond are stipulated by the parties. Terminal Shipping Company was principal on the bond and Seaboard Surety Corporation was surety.

By order dated December 4, 1953, the District Director imposed a fine of $500 against Terminal Shipping Company, allowing the maximum mitigation of $500.

Ober, Williams, Grimes & Stinson filed a timely appeal to the Board of Immigration Appeals, and by order dated August

2. In case No. 8424, the fine notice was served on the agent and the bond filed before the S.S. Captain K. Papazoglou sailed from Baltimore; in case No. 8425, the S.S. Sunavis had sailed before the fine notice was served on the agent and the bond filed.

27, 1954, the Board reopened the matter in order to give counsel an opportunity to answer certain questions raised by the Board. In its opinion and order of August 27, 1954, the Board said *inter alia:*

"In these circumstances it would appear that the alien was merely paid his wages and that he was not paid off or discharged within the meaning of Section 256 of the Immigration and Nationality Act.

\* \* \* \* \* \*

"Under United States laws and court decisions the term 'pay off' in maritime parlance is generally accepted as meaning the payment to a seaman of all earned wages due him to a certain date, and the term 'discharge' means the termination of contractual obligations between an employing ship owner or operator and a seaman for a given voyage. Either term by itself unqualifiedly indicates the termination of a seaman's employment.

"The chief of the Division of Operations, Office of the National Shipping Authority and Government Aid, Maritime Administration, Department of Commerce, indicates as his opinion that a foreign seaman serving on a foreign vessel who is paid all wages due him in a United States port, removed from his ship and repatriated to his home country for further employment with the same shipping concern, but not necessarily on the same ship, is not 'paid off' in the sense of being discharged and employment terminated.

"The United States Coast Guard, Chief, Office of Merchant Marine Safety indicated that the term 'pay off' as applied to vessels of the United States registry has been generally accepted as meaning the final settlement of wages at the completion of a seaman's engagement, and is therefore synonymous with the term 'discharge' in that respect.

\* \* \* \* \* \*

"United States law provides that the shipping articles state the nature and approximate length of the voyage, rate of wages for each seaman, date of joining vessel, et cetera. \* \* \* Upon completion of the voyage as aforestated the seaman is entitled to his discharge and payment of wages. United States laws of navigation do not make any distinction between United States citizens and aliens in this respect.

"In the instant case under consideration the vessel is of Panamanian registry and while there has been a computation of wages there is nothing in the record to show that this was a mere payment of wages or payment so as to constitute a discharge or a discharge from the ship's articles.

"As a matter of fact, it appears from the evidence of record that the seaman was in the act of applying for permission from the United States Immigration and Naturalization Service to be 'paid off' and 'discharged' as the terms are used in the Act, in all probability synonymously, and that such application was denied whereupon the temporary landing theretofore granted was revoked and the alien was returned to the ship, this indicating that he was merely paid his wages and that his services were not terminated.

\* \* \*

"The evidence of record in this case does not establish a 'pay off' or 'discharge' from the vessel and it becomes necessary to reopen the hearing for additional evidence.

"Order: It is ordered that the hearing be reopened to give counsel an opportunity to show (1) that the master did not pay off the alien seaman; (2) to show more fully the terms and conditions of the contract of alien's employment aboard the ship; (3) whether the money paid as shown by the schedule was a part payment of wages pursuant to contract of employment; (4) whether

such payment of wages was a termination of contract of employment and (5) requirements of the Panamanian authorities regarding paying off and discharging seamen."

Pursuant to that order, counsel filed an affidavit of the master which establishes that the master understood the term "pay off" to mean the termination of employment; that he did not intend to pay off Bouboulinis in that sense because Bouboulinis was still a member of the crew and had not signed off the vessel's articles. The articles provided that men in the crew could be discharged in United States ports provided the immigration authorities granted that permission. When that permission was refused, the master knew that Bouboulinis was to remain a crew member and so did Bouboulinis. In paying earned wages in Baltimore, the master did not intend to terminate the employment, but felt that since Bouboulinis had earned the money it was his duty to pay it to him. This is in accord with the Panamanian law requiring payment to crewmen in all ports where cargo is discharged.

Despite this affidavit, the Board, on April 19, 1955, dismissed the appeal, stating:

"We, however, find this contention to be invalid. We hold that the term 'pay off' as used in Section 256 of the Immigration and Nationality Act means to pay a crewman the wages due without signing him off the vessel's articles. That is, we take the position that a 'pay off' has occurred when the crewman has been paid the wages due him, even though such payment is not accompanied by termination of the crewman's employment aboard the vessel on which he arrived in the United States. That is precisely the situation we find here."

On the other question, whether the agent may be fined where the master paid off the alien crewman, the Board said:

"The statute provides that it shall be unlawful for any person, including those specifically named to pay off or discharge any alien crewman without first having obtained the consent of the Attorney General, and that term 'person' includes the owner, agent, consignee, charterer, master, or commanding officer. The statute thereby makes all those named equally responsible to see that no alien crewman is paid off or discharged without the consent of the Attorney General first having been obtained. The Congress was aware of the situation that after a Master had departed he is unavailable and so in adopting Section 256 of the Immigration and Nationality Act Congress obviously made it apply to all, and it is our conclusion that the terminology makes all those mentioned equally responsible for the full enforcement of the provisions thereof. (Matter of S. S. Republic, F 0612–423, B.I.A., February 1, 1954; Int.Dec. 562.)"

Though demand has been made, the principal and surety on the bond have refused to pay the fine.

A. Was Bouboulinis paid off within the meaning of section 256?

Defendants contend that the term "pay off" is a word of art, long used in the shipping industry to indicate paying a seaman his earnings and terminating either the shipping articles under which he is sailing or his service on board the vessel; that the meaning in the industry includes the meaning generally given the word "discharge", although the reverse is not necessarily true.

If the term "pay off" implies a termination of the shipping articles or of the seaman's service on board the vessel, it is clear that Bouboulinis was not paid off by the master of the La Myra. The articles which Bouboulinis signed upon joining the vessel had not expired nor been terminated, and his service on

board the vessel had not been terminated otherwise.

After the master had applied unsuccessfully for permission to change the crewman's landing status under 8 C.F.R. sec. 256.2, so that he could be paid off or discharged, the crewman himself requested permission under 8 C.F.R. sec. 252.4. In both instances the requirements of the regulations were fully complied with, although permission was denied in both instances.

Both the master and Bouboulinis accepted this ruling; Bouboulinis continued in the service of the vessel and sailed with her when she left Baltimore.

The construction of the term for which defendants contend is supported by the original decision of the Board of Immigration Appeals in this case, quoted above, by the authorities cited by the Board, and impliedly by Norris, The Law of Seamen, Vol. 1, sec. 82.

The government contends that we are not really concerned here with the meaning of "pay off" in maritime parlance, but rather with the broad scope of the immigration statutes as a whole; that a fully paid alien is more likely to desert than one who still has money coming to him; and that the term "pay off" should be construed to mean "paid in full all wages due to date". The government cites the regulations promulgated by the Immigration and Naturalization Service (8 C.F.R. 256), which treat "pay off" and "discharge" separately.

The construction urged by the government raises insuperable practical difficulties. Suppose a crewman has $100 coming to him when the ship docks. Congress cannot have intended that a fine shall be imposed if the master pays him $100, but not if the master pays him $99.90. If something more than a nominal withholding is required, what test should the master apply? May he safely pay him $1 on account, or $10 or $50 or $80? Such a construction should not be adopted unless clearly required by the language of the statute.

In Newton v. Gulf Oil Corp., 3 Cir., 180 F.2d 491, dealing with the meaning of the word "discharge" in a different statute, 46 U.S.C.A. § 594 et seq., the court said that "discharge" means the termination of the contractual obligations of a given set of articles; that "discharge" and "signing off" are synonymous terms.

Section 33 of the Immigration Act of 1917, which was the predecessor of section 256 and which is quoted in full below under section B, provided that under certain conditions an alien "may be paid off, discharged, and permitted to remove his effects", 39 Stat. 896. This indicates that Congress understood the term "pay off" to involve a termination of service on the vessel.

The terms "pay off" and "discharge" are not synonymous, but I find as a fact that masters, agents and others engaged in maritime activities understand that the term "pay off" implies a termination of service on the vessel and not a mere payment of wages earned to date.

It should be so construed in section 256.

B. Was the fine properly imposed on the agents?

The question whether the government may assess the fine against the ship's agent when an alien crewman has been paid off or discharged in violation of section 256 by a person other than the agent, must be considered in the light of former statutes, and decisions construing them.

Section 256 of the Immigration and Nationality Act of 1952, which is quoted above in the first paragraph of this opinion, had its inception in the Immigration Act of 1917, 39 Stat. 896. Section 33 of that Act provided:

"That it shall be unlawful and be deemed a violation of the preceding section to pay off or discharge any alien employed on board any vessel arriving in the United States from any foreign port or place, unless duly admitted pursuant to the laws and treaties of the United States regu-

lating the immigration of aliens: Provided, That in case any such alien intends to reship on board any other vessel bound to any foreign port or place, he shall be allowed to land for the purpose of so reshipping, under such regulations as the Secretary of Labor may prescribe to prevent aliens not admissible under any law, convention, or treaty from remaining permanently in the United States, and may be paid off, discharged, and permitted to remove his effects, anything in such laws or treaties or in this Act to the contrary notwithstanding, provided due notice of such proposed action be given by the master or the seaman himself to the principal immigration officer in charge at the port of arrival."

No penalty was provided in section 33, but the "preceding section" referred to therein, section 32, provided as follows:

"That no alien excluded from admission into the United States * * * shall be permitted to land in the United States, except temporarily * * *, and the negligent failure of the owner, agent, consignee, or master of such vessel to detain on board any such alien after notice in writing by the immigration officer in charge at the port of arrival, and to deport such alien, if required by such immigration officer or by the Secretary of Labor, shall render such owner, agent, consignee, or master liable to a penalty not exceeding $1,000, for which sum the said vessel shall be liable, and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense."

In The Limon, D.C.S.D.N.Y., 14 F.2d 153, the ship was held liable for the penalty provided by the statute when a master paid off and discharged an alien crewman in violation of section 33.

Section 20(d) of the Immigration Act of 1924 repealed section 32 of the Immigration Act of 1917. Subsections (a–c)

of section 20 of the Act of 1924 enacted a new section to take its place. The new section was codified as 8 U.S.C. § 167. When section 33 of the Act of 1917, quoted above, was codified as 8 U.S.C. § 168, the words "and be deemed a violation of the preceding section" after the words "It shall be unlawful" in the first sentence, were omitted. This omission left 8 U.S.C. § 168 without sanctions, although as sections 167 and 168 then read there would have been few, if any, violations of section 168 without a violation of section 167 also.

When Congress was considering the Immigration and Nationality Act of 1952, the House Comittee reported, House Report No. 1365, Feb. 14, 1952, U.S.Code Cong. Adm. News, 82d Congress, 2d Session, 1952, Volume 2, p. 1653, at p. 1722:

"Section 256 corrects a deficiency in existing law. At present, a crewman who intends to reship on another vessel may be paid off and discharged if due notice of the proposed action is given by the master of the vessel, or by the crewman himself, to the immigration officer in charge at the port of arrival. However, no sanctions are provided for a failure to give such notice. Under the language of the bill, the consent of the Attorney General must be obtained prior to the paying off or the discharging of an alien crewman, and failure to obtain such consent will subject the owner, master, commanding officer, agent, consignee, or charterer to liability for a fine of $1,000 for each violation and clearance of the vessel or aircraft may be refused until such liability is satisfied."

The Act of 1952 also amended old 8 U.S.C. § 167, to correct a weakness which had become apparent as the result of several cases, e. g. United States v. J. H. Winchester & Co., 2 Cir., 40 F.2d 472. In that case the court noted that section 32 of the 1917 Act had been found inadequate to prevent the unlawful entry of aliens posing as seamen and jumping ship upon arrival in this country,

and that section 20 of the 1924 Act had been intended to provide more effective means to combat that evil. The first clause of paragraph (a) of section 20 imposed an absolute duty upon each of the owner, charterer, agent, consignee or master to keep alien seamen on board until the immigration officer had inspected the crew. The second clause eliminated the element of "negligence", and penalized an owner, charterer, agent, consignee or master who failed to detain after inspection "if required" by the immigration officer. A new remedy was provided by forbidding clearance of the vessel until the penalty was paid or secured; under the former statute the procedure was to file a libel. Paragraph (b) was also new, and simplified the matter of proving violations.

No difficulty was experienced with the first clause of section 20(a) of the 1924 Act, 8 U.S.C. § 167(a), which imposed a penalty of $1,000 on "the owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof who fails to detain on board any alien seaman employed on such vessel until the immigration officers in charge at the port of arrival had inspected such seaman." 43 Stat. 164. Such a penalty against the ship's agent was approved in United States v. Arnold Bernstein S. S. Line, D. C.S.D.N.Y., 44 F.Supp. 19, 20, although the alien crewman had jumped overboard before the vessel arrived at her dock and was seen swimming in the waters of New York Harbor in the direction of the shore too late to overtake him. The judge said:

"It is clear that with respect to the escape of a seaman before inspection by the immigration authorities, Congress has imposed an absolute obligation on each of those named in the statute to detain as to prevent an escape by any of the crew. (Winchester case, supra. Note—the dissenting opinion agrees with the majority of the court on this point.)

"The statute imposes a liability not only on the master and owner who usually control a vessel and its crew, but also upon the agent, charterer and consignee who are compelled to take the necessary steps to produce all alien seamen for inspection. Again, in the Winchester case, Judge Swan pointed out that if they (owner, agent, charterer and consignee) rely on the master's precautions and these prove to be inadequate, each one must suffer the penalty imposed by the statute."

In the Winchester case, however, the penalties had been levied because of the violation of the second clause of section 20(a), which imposed a penalty on an owner, charterer, agent, consignee, or master "who fails to detain such seaman on board after such inspection or to deport such seaman if required by such immigration officer or the [Attorney General] to do so". A majority of the Second Circuit held that the language just quoted required that the inspector's demand be brought home to the person sought to be charged, by notice to him or to his authorized agent, and further found that such notice to the master was not notice to the local agent of the vessel's foreign owner. To the same effect is Compagnie Generale Transatlantique v. Elting, 298 U.S. 217, 56 S.Ct. 770, 80 L.Ed. 1151, where the Supreme Court, speaking through Mr. Justice Van Devanter, held that notice to the master was not notice to the owner. This defect in the statute was cured by section 254 of the 1952 Act, 8 U.S.C.A. § 1284, which now imposes the penalty on the owner, agent, consignee, charterer, master or commanding officer of any vessel who fails (1) to detain the alien crewman on board until he has been inspected or "(2) who fails * * * to detain any alien crewman on board * * * after such inspection unless a conditional permit to land temporarily has been granted such alien crewman * * *".

In all of the statutes Congress has been looking to the ship in one way or anoth-

er. In the Act of 1917, the penalty was enforced by libel against the ship. In the Act of 1924, the following provisions appeared in section 20(a): "No vessel shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the collector of customs." Section 20(a) was codified as 8 U.S.C. § 167, and is the predecessor of section 254 of the Act of 1952, 8 U.S.C.A. § 1284. The provision just quoted appears in section 254(a), 8 U.S.C.A. § 1284(a). The same provision also appears in the new section 256, 8 U.S.C.A. § 1286, involved in the instant cases.

In neither section, however, is any provision made for levying the fine against the ship by libel or otherwise, but it is contemplated that the bond will be filed and the fine will be collected from the principal or surety on the bond.

In a case arising under section 20(a) of the Act of 1924, old 8 U.S.C. § 167(a), Indemnity Ins. Co. of North America v. United States, 5 Cir., 74 F.2d 22, 23, the court said:

"It [the statute] unequivocally subjects a vessel to the payment of $1,000 for each alien seaman whom the master has failed to detain on board after he has been served with a detention order by the immigration officer in charge, or some one acting for him. * * * To secure payment of the fine the statute prohibits the clearance of vessels while the fine remains unpaid, but provides that clearance may be granted prior to the determination of liability upon the deposit of a sufficient sum, or the execution of a bond with sufficient sureties. Having the option to make bond or deposit cash, the master cleared his vessel by tendering bond. Under no compulsion to do so, and with full knowledge of the claimed duress, * * * the protest of the master being noted at the foot of the bond, appellant signed as surety. Because of the making and tender of the bond, the vessel was released. Under these estopping circumstances, appellant has a heavy burden to point out some illegality or invalidity nullifying the obligation it assumed." (Citing many cases.)

In that case no question was raised about who actually paid off or discharged the alien crewman.

To the same effect is National Surety Corp. v. United States, 5 Cir., 143 F.2d 831.

National Surety Co. v. Holtzman, 4 Cir., 43 F.2d 544, 545, dealt with two actions brought in the District Court of the United States for the District of Maryland on bonds in which appellant was surety, in case No. 2986, with the Mutual Lloyd Marine Corporation, general agents of the steamship Emilia Pellegrina as principal, and in case No. 3001, with the captain of the steamship Dalmazia as principal. The court said:

"The condition of both bonds is similar, and recites that, whereas a claim is asserted by the collector of customs of the port against the steamships for a fine on account of their alleged failure to detain on board alien seamen, the condition is to the effect that the surety shall pay the collector of customs any and all fines for which the said steamships are liable under the provisions of sections 19 and 20 of the Immigration Act of 1924 (8 U.S.C.A. §§ 166, 167)."

The cases arose under section 20(a) of the Act of 1924, old 8 U.S.C. § 167; it appears that in each case members of the crew ordered to be detained had deserted, and the bonds had been given in order that the respective vessels might clear. The principal contention raised by the surety seems to have been "that the determination of the liability to the payment of the fine was a condition preced-

ent to the liability of appellant on its bond; and, such determination of liability never having been made, this action was prematurely brought; and that the proof failed to establish the violation of the statute or the liability of any particular person therefor, for whom the appellant in any event could be considered answerable." It is not clear against whom the fine had been assessed, and that question was not discussed in the opinion. The court said: "The ship, because of the giving of the bond, is released and is not within the jurisdiction of the court, and a proper determination of all issues involved can be had in the present trial."

The decisions under the earlier acts, however, do not solve the problem in this case. The second sentence of section 256 of the Act of 1952, 8 U.S.C.A. § 1286, is quite different from any previous statute. The third sentence, dealing with denial of clearance and filing of a surety bond, is the same as the provision of the Act of 1924 involved in the Fourth and Fifth Circuit cases just discussed. The bonds in the case at bar are conditioned "that if the above-bounden principal shall pay to the Collector of Customs at any of the said ports at or nearest which the liability is incurred any and all fines (or penalties) imposed by the Attorney General under the said sections of the said Act against the owner, master, commanding officer, purser, person in charge or command, agent, charterer, or consignee of the said vessel (or aircraft); then this obligation shall be void, otherwise it shall remain in full force and effect; the said principal to have, however, the privilege of making such payments under protest, and without prejudice to any and all legal rights of recovering by appropriate action or proceedings any and all sums paid under this bond."

The defendants contend that although under this form of bond the principal and surety are liable for any fine which may be properly levied against anyone, no fine can properly be levied under section 256 unless the person fined is the one who paid off or discharged the alien crew-man in violation of section 256. In other words, defendants contend that section 256 should be construed as though the second sentence thereof read "If it shall appear to the satisfaction of the Attorney General that any alien crewman has been paid off or discharged in the United States in violation of this section, the owner, agent, consignee, charterer, master, commanding officer, or other person, as the case may be, who paid off or discharged such alien crewman, shall pay to the collector of customs of the customs district in which the violation occurred the sum of $1,000 for each such violation". The government contends that it should be construed as though it read "If it shall appear to the satisfaction of the Attorney General that any alien crewman has been paid off or discharged in the United States in violation of this section, the owner, agent, consignee, charterer, master, commanding officer of such ship or aircraft, as well as the person who actually did the act forbidden in the first sentence, shall pay * * *".

The section is certainly badly drawn and ambiguous. The meaning of the word "such" in the second sentence is far from clear. I am not prepared to accept without qualification the construction proposed by either of the parties. I do feel, however, that there is a great deal of sense in the comment by Judge Learned Hand in his dissenting opinion in the Winchester case, 40 F.2d at page 474: "This is of course a penal statute and we must assume nothing against the defendant, but that is no reason for not giving it such latitude as will effect its whole purpose, if that can be gathered."

It seems to me that the purpose of this new statute can be gathered from the four sentences which comprise the section. That purpose is that the owner, agent, consignee, charterer, and master shall all be responsible for seeing that an alien crewman is not paid off or discharged in violation of section 256; that the ship shall be detained until a proper bond is posted; that the principal on the

bond shall be such owner, agent, consignee, charterer, master, commanding officer or other representative of such ship or aircraft as may be available and willing to post the bond to free the ship; that the fine shall be levied against such agent or master or other representative of the ship and its owners as may be available to receive the notice of the proposed fine, to show cause why a fine should not be imposed or, if imposed, why it should be mitigated or remitted, and to present evidence and arguments to avoid the penalty or evidence of any mitigating circumstances; and that the fine so levied against such representative of the ship shall be paid in the first instance by the principal or surety on the bond. The principal or surety so paying may then collect from the owner, master, insurer or other person, who, in the light of the contracts between the parties, should bear the ultimate impact of the fine.

This construction is fortified by the decisions of the Fourth and Fifth Circuits discussed above, and by common sense. The principal interest of all concerned is that the ship be not detained in port while the government hunts for the person who actually paid off the crewman in order to serve him with notice of intention to fine, and while that person procures the necessary bond. In case No. 8425, involving the S. S. Sunavis, the person who actually paid off and discharged the alien crewman was the British Consul in Baltimore. He must have done so as agent for the owner, master or local agent of the ship; but the construction of the statute which seems to me to be proper avoids the troublesome questions of agency discussed in the Winchester and Compagnie Generale cases, which Congress clearly indicated it wished to avoid when it passed sections 254 and 256 of the Immigration and Nationality Act of 1952. I conclude that Congress intended that the owner, agent, consignee, charterer, master and commanding officer of the ship should all be responsible for a violation of section 256,

not merely that one who happened to pay off or discharge the alien crewman.

██ It follows that the fine was properly levied against the agent in case No. 8424, the S. S. Captain K. Papazoglou, and case No. 8425, the S. S. Sunavis, in both of which it is admitted that the alien crewman was discharged in violation of section 256; but that the fine was not properly levied in case No. 8423, the S. S. La Myra, because the alien crewman in that case had not been paid off or discharged within the meaning of section 256.

Counsel will prepare judgment orders giving effect to this decision.