**UNITED STATES of America,**
**Appellant,**

**v.**

**SEABOARD SURETY COMPANY,**
**Appellee.**

**NATIONAL SURETY CORPORATION,**
**Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**Nos. 7295, 7296.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 12, 1956.

Decided Dec. 17, 1956.

As Amended Jan. 7, 1957.

Lino A. Graglia, Attorney, Department of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Walter E. Black, Jr., U. S. Atty., Baltimore, Md., and Samuel D. Slade, Attorney, Department of Justice, Washington, D. C., on brief), for U. S.

Randall C. Coleman, Jr., Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for Seaboard Surety Co. and National Surety Corp.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and HOFFMAN, District Judge.

HOFFMAN, District Judge.

In three appeals involving actions consolidated by agreement the United States of America (hereinafter referred to as the Government) asks that the judgment of the District Court of Maryland exonerating the Seaboard Surety Company (hereinafter referred to as Seaboard) be reversed, and National Surety Corporation (hereinafter referred to as National) seeks a reversal of the District Court in upholding the actions of the District Director of the Immigration and Naturalization Service in imposing fines of $500.00 against the local agents for certain vessels hereinafter mentioned. Seaboard is involved in one case and National is concerned with two cases, the

essential facts being the same in all three cases except that in the National cases there is no question as to whether or not the employment of the alien crewmen was terminated. The opinion of the Court below is reported in 140 F.Supp. 876.

Section 256 of the Immigration and Nationality Act of 1952, 66 Stat. 223, 8 U.S.C.A. § 1286, provides:

"It shall be unlawful for any person, including the owner, agent, consignee, charterer, master, or commanding officer of any vessel or aircraft, to pay off or discharge any alien crewman, except an alien lawfully admitted for permanent residence, employed on board a vessel or aircraft arriving in the United States without first having obtained the consent of the Attorney General. If it shall appear to the satisfaction of the Attorney General that any alien crewman has been paid off or discharged in the United States in violation of the provisions of this section, such owner, agent, consignee, charterer, master, commanding officer, or other person, shall pay to the collector of customs of the customs district in which the violation occurred the sum of $1,000 for each such violation. No vessel or aircraft shall be granted clearance pending the determination of the question of liability to the payment of such sums, or while such sums remain unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of an amount sufficient to cover such sums, or of a bond approved by the collector of customs with sufficient surety to secure the payment thereof. Such fine may, in the discretion of the Attorney General, be mitigated to not less than $500 for each violation, upon such terms as he shall think proper."

The particular questions presented to us on these appeals are as follows:

(1) Whether Section 256 of the Immigration and Nationality Act of 1952, prohibiting the "pay off or discharge" of alien seamen in American ports without the consent of the Attorney General, prohibits the paying of an alien seaman's wages in full although his contractual employment under the ship's articles is not terminated, and

(2) Whether the fine imposed under Section 256 is in the nature of an *in rem* liability of the vessel assessable against any one of the persons responsible for the vessel and named in Section 256, regardless of which of them actually performed the physical act of paying off or discharging, or whether the fine is assessable *in personam* only and thus only the liability of the person performing the physical act as aforesaid.

In the Seaboard case, the S.S. Lamyra, of Panamanian registry, arrived at Baltimore on January 21, 1953, with an alien seaman named Bouboulinis as a member of her crew. After inspecting the crew an Immigration Inspector issued to Bouboulinis a form generally referred to as a D-1 landing permit, permitting the seaman to land but requiring him to depart with the next sailing of the vessel. As the crewman desired to terminate his employment aboard the vessel, the Master, being willing to comply with the seaman's request, made application to the Immigration Service to change the alien's landing permit from D-1 to D-2 which, if granted, would have unquestionably permitted the pay off and would have allowed the alien to ship foreign on a different vessel from the one to which he was then attached. The Master's application was refused by Immigration. Thereafter, on January 23, 1953, and in accordance with the Panamanian law providing that earned wages are to be paid to crewmen in ports of discharge, the Master paid Bouboulinis all of his earned wages. As the vessel discharged cargo at Baltimore, it is conceded that the Master complied with the Panamanian law even though the seaman's articles of employment would not have expired for ap-

proximately six months. It was on January 26, 1953, that the seaman personally appeared at the Immigration office in Baltimore to again request a change in his landing status and again the request was refused but, during the course of conversation, it was ascertained that Bouboulinis had been paid all of his earned wages. Thereupon Immigration Service revoked the alien's D–1 landing permit, caused him to be placed aboard the vessel, and the ship sailed with Bouboulinis aboard on January 27, 1953. The following day Terminal Shipping Company, local agent for the vessel, was served with a notice of intention to impose a fine in the sum of $1000.00 for the alleged violation of Section 256 of the Act in paying Bouboulinis the entire amount of his earned wages without the consent of the Attorney General. In due time a bond in the sum of $1,000.00 was executed by Terminal Shipping Company as principal and Seaboard as surety, which said bond was on a prescribed form and filed with the Collector of Customs. Subsequently the District Director of the Immigration and Naturalization Service imposed a fine of $500.00 against Terminal Shipping Company, allowing the maximum mitigation of $500.00 as provided by law. The Board of Immigration Appeals declined to disturb the ruling of the District Director and, when the agent and surety refused to pay the fine, the Government instituted this action.

Substantially the same pattern was followed in the two cases involving National. One concerned a vessel of Greek registry in which the alien seaman was granted a D–1 landing permit upon the vessel's arrival at Baltimore on January 1, 1953. The seaman reported ill to the Master and on January 3, 1953, was sent to the United States Public Health Service Hospital where he was advised to return two days later for an operation. Upon reporting these facts to the Master and expressing a desire to be hospitalized in Greece, the Master "paid off" the seaman without the consent of the Attorney General, and with knowledge of the fact that the seaman intended to go to New York to be repatriated to Greece on another vessel. Being apprehended before he could leave Baltimore, the alien's D–1 landing permit was revoked, a detention notice was served on the Master and local agent, Cottman Company, and the crewman sailed with the vessel. The subsequent notice of intention to fine, posting of bond, imposition of fine, appeal, mitigation, and refusal to pay, all correspond with the Seaboard case and need not be repeated.

The distinguishing features of the third case present a vessel of Canadian registry in which the seaman was granted a D–1 landing permit and thereafter was taken before the British Consul in Baltimore, where the seaman was "paid off and discharged" by the Consul to permit the seaman to take his annual leave. The permission to discharge the crewman was not obtained from the Attorney General. The local agent, Penn-Maryland Steamship Corporation, was served with notice of intention to fine, the bond was posted, the fine imposed allowing maximum mitigation, the appeal dismissed, and thereafter followed a refusal to pay.

The District Court correctly construed the term "pay off" as words of art which, from accepted practice in the shipping industry, carry with it a clear indication that a seaman receive his wages upon termination of his employment under either the articles or his service on board the particular vessel. Termination of the employment by the affirmative act of either the employer or employee is a necessary element to the imposition of any fine under Section 256 of the Immigration and Nationality Act. Such was the construction of the term in the original decision of the Board of Immigration Appeals in the Seaboard case, but a later opinion interpreting the regulations promulgated by the Immigration and Naturalization Service (8. C.F.R. 256) treats as separate elements the words "pay off" and "discharge".

The Government urges that a fully paid seaman is more likely to desert his vessel than one to whom wages are still

due. The fallacy of this argument is revealed in an examination of the statutes of the United States pointing out that a seaman on either foreign or domestic vessels must, upon demand, be paid by the Master to the extent of one-half of the balance of his earned wages remaining unpaid at every port in the United States where the vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended. Section 31 of the LaFollette Seaman's Act of 1920, 41 Stat. 1006, 46 U.S.C.A. § 597. The statute goes further and provides that if a Master fails to comply with the seaman's demand, the seaman is released from his contract and forthwith entitled to full payment of wages earned. In re Williams, 4 Cir., 139 F.2d 262. Had it been the intention of Congress to limit to one-half the amount of earned wages to which a seaman is entitled, it would have been a relatively simple matter to word the statute appropriately. There is no merit to the contention of the Government that a seaman should not receive in excess of one-half of his earned wages and that a payment of substantially more than one-half of same, without the consent of the Attorney General, should be considered as a "pay off" under Section 256 and the full equivalent of a "discharge". Even if we were to accept the view advanced by the Government, which we do not, there is nothing to prevent the payment of earned wages less one cent, all of which would reduce to an absurdity the theory that a seaman is more likely to desert his vessel when there are no wages due to him.

■ It was, of course, necessary for Congress to use the word "discharge" in Section 256. Foreign seamen on foreign vessels may have drawn advances against unearned wages in accordance with the law of the flag and, while this practice is prohibited by the laws of this country under the provisions of 46 U.S.C.A. § 599, the restriction would not apply to advancements made by foreign vessels while in foreign ports where such payments are sanctioned in foreign countries. Sandberg v. McDonald, 248 U.S.

185, 39 S.Ct. 84, 86, 63 L.Ed. 200. A situation could arise whereby a foreign seaman would have no earned wages due to him upon arrival at a port of loading or unloading in the United States, thus making apparent the necessity of the use of the term "discharge". Similarly, use of the words "pay off" is essential to meet the factual situation as presented in one of the National cases wherein the seaman was not "discharged" by the affirmative act of the Master, but was "paid off" in order that the seaman could go to New York to be repatriated to Greece on another vessel. In either instance there is an intention, coupled with an affirmative act, to terminate the employment relationship. Section 256 was designed to limit the right to terminate employment of alien crewmen and to place such right under the control of the Attorney General. As long as the employer-employee relationship continues, as it undoubtedly did in the Seaboard case, there remains no right to impose a fine under Section 256 of the Immigration and Nationality Act of 1952 merely because a foreign seaman has been paid in full his earned wages.

■ Holding as we do that the terms "pay off" and "discharge" are virtually synonymous as used in the Act and Regulations applicable thereto, it follows that, in the Seaboard case, the Master, who paid in full the earned wages to the seaman upon arrival at the Port of Baltimore, did not violate the provisions of Section 256 as the employment relationship had not been terminated.

The remaining question commands a study of the purpose of the Act authorizing the imposition of fines imposed by reason of "paying off" and "discharging" an alien crewman without the consent of the Attorney General. Section 32 of the Immigration Act of 1917, 39 Stat. 896, called for the imposition of a fine as to any alien permitted to land in the United States other than temporarily (if otherwise excluded from admission) in these words:

" * * * and the *negligent* failure of the owner, agent, consignee,

or master of such vessel to detain on board any such alien after notice in writing by the immigration officer in charge at the port of arrival, and to deport such alien, if required by such immigration officer or by the Secretary of Labor, shall render such owner, agent, consignee, or master liable to a penalty not exceeding $1,000, *for which sum the said vessel shall be liable*, and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense."

The foregoing section of the Act of 1917 was deemed inadequate to prevent the unlawful entry of aliens posing as seamen and jumping ship upon arrival in this country. The Act of 1924, Section 20(a), purported to correct this evil by eliminating the necessity of establishing negligence and imposing an absolute duty upon each owner, charterer, agent, consignee, or master, to keep the alien seamen on board until after inspection and thereafter "if required" by the immigration officer. The Act of 1924 removed the provision made for levying the fine against the vessel by libel proceedings and substituted in lieu thereof the following:

"No vessel shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the collector of customs."

Section 20(a) of the Act of 1924 above quoted was codified as 8 U.S.C. § 167, and is the forerunner of Section 254(a) of the Act of 1952, 8 U.S.C.A. § 1284(a). The same provision also appears in the Act of 1952 as Section 256, 8 U.S.C.A. § 1286, which is the particular section under consideration in the instant cases.

■ National, the surety company concerned with a determination of this issue, asserts that the elimination of the words "for which sum the said vessel shall be liable", which originally appeared in the Act of 1917, but were removed at the time of the passage of the Acts of 1924 and 1952, establishes clearly the intent of Congress to change the liability from *in rem* to *in personam*. With this contention we do not agree. In our opinion the Acts of 1924 and 1952 modified the procedural aspects of imposing the penalty and clearing the vessel, but at all times it remained the intention of Congress to look to the vessel and its management for the payment of the fine. Indeed, the form of the bond required by the Acts of 1924 and 1952 effectively forecloses any such technical defense as now interposed by the surety and appears to obligate the principal therein to pay any and all fines imposed by the Attorney General under the appropriate sections of the Act against the owner, master, agent, charterer, or consignee of the vessel. As the fine could not be imposed separately upon each of the individuals named, it follows that Congress intended for the vessel and its management to stand the ultimate responsibility for same.

Relative to the "pay off" and "discharge" by the British Consul in one of the cases, it is clear that, for the purposes herein stated, the British Consul was merely an agent of the management of the vessel. The wages were paid from funds of the vessel and, furthermore, Section 256 makes it unlawful for *any person*, including the owner, agent, etc., to "pay off" or "discharge" any alien crewman without first obtaining the consent of the Attorney General.

While no question was raised as to who actually paid off or discharged the alien crewman in Indemnity Ins. Co. of North America v. United States, 5 Cir., 74 F.2d 22, 23, the Court, in construing Section 20(a) of the Act of 1924, had this to say:

"It [the statute] unequivocally subjects a vessel to the payment of $1,000 for each alien seaman whom the master has failed to detain on

board after he has been served with a detention order by the immigration officer in charge, or some one acting for him. * * * To secure payment of the fine the statute prohibits the clearance of vessels while the fine remains unpaid, but provides that clearance may be granted prior to the determination of liability upon the deposit of a sufficient sum, or the execution of a bond with sufficient sureties. * * * Under no compulsion to do so, and with full knowledge of the claimed duress * * * the protest of the master being noted at the foot of the bond, appellant signed as surety. Because of the making and tender of the bond, the vessel was released. Under these estopping circumstances, appellant has under a heavy burden to point out some illegality or invalidity nullifying the obligation it assumed."

Similar holdings in National Surety Corp. v. United States, 5 Cir., 143 F.2d 831, and National Surety Co. v. Holtzman, 4 Cir., 43 F.2d 544, 546, both decided under the Act of 1924, point out that the claims are asserted against the steamships and, while the validity of the fines may be tested in proper actions at the time of trial as indicated in the Seaboard case, infra, the *in rem* status of the claims remains. In the Holtzman case, supra, the Court said: " 'It is the duty of the surety to see that the principal performs his contract in accordance with its terms and to perform it himself if the principal fails.' Here the surety in executing the bond had directly taken upon itself the responsibility of paying all fines for which the ships were liable." If this is not the law, the effectiveness of the penalties imposed under Section 256 would be destroyed as it would be extremely difficult, prior to the clearance and departure of the vessel, to ascertain the individual who actually participated in the "pay off" or "discharge".

It was to correct the apparent defects in the Act of 1924 as revealed in United States v. J. H. Winchester & Co., 2 Cir.,

40 F.2d 472, and Compagnie Generale Transatlantique v. Elting, 298 U.S. 217, 56 S.Ct. 770, 80 L.Ed. 1151, that Sections 254 and 256 of the Act of 1952, 8 U.S.C. A. §§ 1284, 1286, were enacted. Both of these cases held that notice of a violation to the master was not notice to the owner. To avoid the question of agency, Congress passed the Act of 1952 from which it appears that it was intended to hold all of the parties named therein responsible for a violation of Section 256, and not merely the one who happened to "pay off" or "discharge" the alien crewman. They are held under the theory that each is the agent of the vessel for this purpose, and the act of one constitutes the act of all. And it should be noted that Section 254 rewrote Section 20 (a) of the Act of 1924 so as to eliminate the words "if required" in connection with the duty to detain after inspection.

■ The administrative regulations of the Immigration and Nationality Act establish a procedure for imposing and collecting fines. It is stated that the Notice of Intention to Fine, Form I–79, shall be addressed to any or all of the available persons subject to fine. The purpose of this notice is to assure that some person having an interest in the ship's operation be advised so that the clearance bond may be posted and exculpatory or mitigating circumstances may be presented. When this is considered in conjunction with 66 Stat. 230, 8 U.S. C.A. § 1330, providing that the withholding or denial of clearance of or a lien upon any vessel or aircraft shall not be regarded as the sole and exclusive means or remedy for the enforcement of payments of any fine, penalty or expenses imposed or incurred, but that the amount thereof may be recovered by the United States in any civil suit from any person made liable under any of the sections, it is abundantly clear that Congress intended to look to the vessel or to any person named in Section 256 for the payment of the fines prescribed therein.

The several judgments of the District Court are

Affirmed.