MATTER OF HMS "BOUNTY"

In FINE Proceedings

BOS–10/11.73

*Decided by Board December 10, 1963*

(1) Even though the vessel was touring the United States engaged in a promotional scheme for a motion picture rather than in a "normal commercial maritime operation," fine lies under section 256, Immigration and Nationality Act, for paying off and discharging 5 alien crewmen without first having obtained the consent of the Attorney General.

(2) Section 256 provides for the imposition of a separate penalty for each crewman who is illegally paid off or discharged, as opposed to a single penalty per vessel regardless of the number of crewmen involved.

IN RE: HMS "BOUNTY" which arrived at the port of Boston, Mass., from foreign, via other United States ports, on August 25, 1962. Alien cewmen involved: Michael Lushington, Hugh Boyd, Ellsworth G. Coggins, Eric S. Hillis and Percy Coffin.

BASIS FOR FINE: Act of 1952—Section 256 (8 U.S.C. 1286).


The District Director at Boston, Mass., in a decision dated April 12, 1963, held that the Boston Shipping Corp., as agents for the HMS "Bounty," had incurred liability to administrative penalties totaling $5,000, $1,000 as to each of the alien crewmen (Canadian nationals) named above, for paying them off and/or discharging them without prior permission from an immigration officer acting for the Attorney General. However, said official found present herein factors which, in his opinion, merited mitigation of the fines to the extent of $2500, $500 per crewman. He then permitted fines in like amount to stand. The appeal from his decision, which brings the case before this Board for consideration, will be dismissed.

The HMS "Bounty" is a wooden sailing vessel, a replica of the original historic vessel of the same name, which was constructed for the purpose of making a motion picture entitled "Mutiny on the Bounty." Upon completion of filming, it was decided to send the vessel on a promotional tour. Said tour was to include port calls at several ports on both coasts of the United States.

The first such call was made at Seattle, Wash., on June 22, 1962. Immigration inspection was then and there accorded the vessel's crew, with the result that the crewmen here involved were granted D-1 conditional landing privileges. Under the terms thereof, they were permitted to land in this country for the time the vessel was to remain in United States ports, but in no event to exceed 29 days; and they could not be paid off and/or discharged without permission of the Attorney General, acting through an immigration officer.[1]

The vessel sailed coastwise from Seattle and eventually arrived at the port of Boston, Mass., on August 25, 1962. From that port, it was scheduled to sail foreign for France, but these five crew members did not desire to continue the voyage further. Accordingly, they were "separated" from the ship,[2] they were paid off and discharged before the Canadian Consul at Boston, and they returned to their homes in Canada.

The facts recited in the foregoing paragraph constitute this case a classic example of a "pay off or discharge" as those terms are used in the statute here under consideration.[3] Therefore, the fines have properly been ordered imposed unless appropriate permission had first been obtained.

Appellant's claim that the requisite permission was obtained rests on an affidavit submitted by the Master. It recites that when the vessel arrived at the port of Boston, it received a tumultuous welcome and was met by a large number of visitors and port officials. It states that one such official, believed to be an immigration officer, was informed of plans to permit these five crewmen to leave the ship. It concludes that he informed the Master it was permissible to do so. This affidavit, however, is unavailing—for several reasons.

First, since the vessel merely sailed coastwise from Seattle to Boston no further immigration inspection was required at the latter port by the regulations.[4] Second, according to the record no immigration officer boarded the ship at Boston to make such an inspection, or otherwise. Third, the regulations spell out a procedure for obtaining permission to "pay off or discharge" crewmen entirely different from that followed by the Master.[5] Fourth, the Service record indicates that the specified procedure was not followed, and no claim has been advanced that it was. Fifth, the parties responsible for the vessel's operation—includ-

---

[1] See arirval manifest (Form I-418) ; Section 252(a) (1), Immigration and Nationality Act (8 U.S.C. 1282) ; and 8 CFR 252.1(d) (1).

[2] See manifest (Form I-418) submitted for the vessel's foreign departure on August 31, 1962.

[3] *U.S.* v. *Seaboard Surety Co.,* 239 F. 2d 667.

[4] 8 CFR 251.1 and 252.1.

[5] 8 CFR 252.1 (d) and (f).

ing the agents and Master—are charged with knowledge of the pertinent regulations. Finally, the record reveals that the Master is an experienced mariner who presumably had personal knowledge of them.

We cannot agree with appellant that it would be unconscionable to permit the fines to stand because this vessel was engaged in an enterprise of great public appeal rather than in a normal commercial maritime operation. Factually, we find no logic in this argument since the ship was touring the United States as a "promotional" scheme which obviously involved the "profit motive." Legally speaking, moreover, the statute applies to "any vessel" so that it includes even privately owned pleasure craft engaged in no commerce whatsoever. While there have been cases in which the question of "normal commercial maritime operation" was discussed, those cases involved the question of "sovereign immunity," to wit: public vessels operating solely for the public purposes of a sovereign nation,[6] which is not the situation presented here.

We also reject the contention that this section of law limits the fine that can be imposed hereunder to $1,000 per vessel no matter how many crewmen are involved. The decisive factors on this point are that the statute makes it unlawful to pay off or discharge "any alien crewman" and provides for the imposition of a penalty "in the sum of $1,000 for each such violation." The clear meaning of the quoted phraseology is that the Congress meant nothing more than that a separate penalty should be assessed for each crewman who is paid off and discharged, as opposed to creating a single violation of the statute per vessel—no matter how many crewmen were involved.[7] While there are no precedents precisely on this point, the fact remains that it has been generally accepted and recognized, by a long line of administrative and judicial interpretation, that this section does justify the imposition of a fine of $1,000 as to each crewman involved.[8] We so hold.

Finally, the request that the fines be further reduced must be and is denied. The reason is that the penalty provided for in the statute cannot be reduced to less than $500 per crewman, and the District Director has already granted this relief.

ORDER: It is ordered that the appeal be and the same is hereby dismissed.

[6] See *Matter of SS "Wave Sovereign,"* 5 I. & N. Dec. 336.

[7] See *Grant Brothers Construction Co.* v. *U.S.,* 58 L. ed. 776; and see also the *Kathlamba,* 18 F. 2d 113.

[8] See the *Limon,* 14 F. 2d 153, and 22 F. 2d 270.